# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JOHN C.,[1] | ) | 3:22-CV-1073 (SVN) |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| KILOLO KIJAKAZI, ACTING | ) | |
| COMMISSIONER OF SOCIAL | ) | September 25, 2023 |
| SECURITY ADMINISTRATION | | |
| *Defendant*. | | |

## DECISION AND ORDER ON PLAINTIFF'S MOTION TO REVERSE AND DEFENDANT'S MOTION TO AFFIRM

Sarala V. Nagala, United States District Judge.

Plaintiff John C. ("Plaintiff") brings this motion pursuant to 42 U.S.C. § 405(g), to appeal the decision of the Acting Commissioner of the Social Security Administration (the "Commissioner" or "Defendant") denying his claim for Social Security Disability Insurance benefits ("SSDI"). Plaintiff filed a motion for an order reversing the decision of the Commissioner or, in the alternative, an order remanding for another hearing. ECF No. 16. Defendant cross-moved for an order affirming the Commissioner's decision. ECF No. 20. For the reasons set forth below, Plaintiff's motion is DENIED, and the Defendant's motion is GRANTED.

---

[1] In order to protect the privacy interest of social security litigants while maintaining public access to judicial records, in opinions issued in cases filed pursuant to § 205(g) of the Social Security Act, 42 U.S.C. § 405(g), this Court will identify and reference any non-government party solely by first name and last initial or by last initial only. *See* Standing Order – Social Security Cases (D. Conn. Jan. 8, 2021).

I.       **FACTUAL AND PROCEDURAL BACKGROUND**

A.   Plaintiff's Medical and Employment History

Plaintiff is a forty-four-year-old man who seeks SSDI based on a combination of medical conditions, including SAPHO syndrome,[2] hidradenitis suppurativa,[3] avascular necrosis,[4] and joint and back pains.  The parties generally agree on Plaintiff's medical history, and the Court will only recount those portions of that history that are relevant to the present motions.

Between 2014 and 2018, Plaintiff worked as a warehouse manager.  Tr. at 56–57.  Plaintiff's relevant symptoms are first documented in the medical records on February 27, 2017, when a physician's assistant ("PA") noted Plaintiff had knee pain, without swelling, that worsened with bending and a "history of episodic lower back pain."  *Id.* at 390–91.  During a follow-up visit on June 7, 2017, a PA first listed SAPHO syndrome as a possible root cause of Plaintiff's symptoms.  *Id.* at 396.  During a PA visit on July 2, 2018, the Plaintiff reported significant arthralgias, or joint pains.  *Id.* at 426.  The PA prescribed methylprednisone for his SAPHO symptoms and, if needed, "a low 5 mg daily dose of prednisone."  *Id.*  The PA also noted Plaintiff's "skin lesions" on his feet in addition to his knee and ankle pain and "low back pain."  *Id.* at 427–28.

To continue monitoring his SAPHO syndrome, Plaintiff began treatment at Hartford Healthcare rheumatology.  *Id.* at 426.  At this point, Plaintiff exhibited "pustulosis of palms and

---

[2] SAPHO is an acronym for synovitis, acne, pustulosis, hyperostosis, and osteitis. See SAPHO syndrome, National Institute of Health, https://rarediseases.info.nih.gov/diseases/7606/sapho-syndrome (last accessed September 25, 2023).  Symptoms relevant to this case include joint pain, inflammation, skin pustules, spinal abnormalities, arthritis, and acne and other skin conditions.  *Id.*

[3] Hidradenitis suppurativa is skin condition marked by small, painful lumps under the skin.  Hidradenitis suppurativa, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/hidradenitis-suppurativa/symptoms-causes/syc-20352306 (last accessed September 25, 2023).

[4] Avascular necrosis is the death of bone tissue, which causes joint paint.  Avascular Necrosis, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/avascular-necrosis/symptoms-causes/syc-20369859 (last accessed September 25, 2023).

soles," for which he was referred to a dermatologist.  *Id.* at 439.  Hartford Healthcare also altered Plaintiff's SAPHO medication because Plaintiff's treatment up to that point caused painful abdominal side effects.  *Id.*  Plaintiff expressed difficulty in staying employed with work involving physical activity, and he asked his primary care provider to complete temporary disability paperwork on his behalf.  *Id.*  Plaintiff was employed in the purchasing department of a company between January and September of 2019.  *Id.*  at 57.

On February 26, 2019, Plaintiff visited Dr. Tejas Sheth, a Hartford Healthcare rheumatologist for a follow-up appointment.  *Id.* at 468–83.  At some point prior to this visit, Plaintiff had been prescribed Humira to treat Plaintiff's sepsis syndrome and lower-limb arthritis— both symptoms of SAPHO.  *Id.* at 477.  At this appointment, Plaintiff reported that Humira treated his symptoms well, and Dr. Sheth noted Plaintiff's physical exam was unremarkable.  *Id.* at 497, 483–84.  Another follow up with Dr. Sheth on June 26, 2019, confirmed that while Plaintiff still suffered from SAPHO and related conditions, that Plaintiff was in "[e]xcellent clinical control of disease activity while being on injectable Humira."  *Id.* at 518.  While Plaintiff saw good results during this period for his joint pain, Plaintiff still exhibited painful skin lesions on his feet and other parts of his body.  *Id.* at 497–98.

On July 8, 2019, State Agency physician Dr. Virginia Ritter reviewed Plaintiff's medical record.  *Id.* at 94–96.[5]  Dr. Ritter noted Plaintiff responded well to treatment, and assessed that Plaintiff's condition was not severe enough to keep him from conducting work at the light exertion level.  *Id.* at 100–02.

In October of 2019, Plaintiff became employed in the sales department of a different company.  *Id.* at 58–59.  On March 20, 2020, after approximately nine months without an

---

[5] Where relevant, the details of the reports from the state agency doctors are discussed in the analysis below.

appointment, Plaintiff had an urgent visit with Dr. Sheth for swelling in his left foot from his SAPHO syndrome.  *Id.* at 519.  Plaintiff complained that he could no longer bear weight on this leg due to the pain, and Dr. Sheth prescribed prednisone and doxycycline.  *Id.* at 520, 524–25.  Dr. Sheth also noted that Plaintiff's left-sided pain was recent, and that his SAPHO syndrome was otherwise in remission with treatment.  *Id.* at 520.  Plaintiff stopped working on April 3, 2020 because he was "missing a lot of work due to doctors' appointments, severe inflammation in both knees and both ankles, [and] lower back pain."  *Id.* at 65.  Plaintiff explained that it was "getting difficult to get there" and to "try to function normally."  *Id.*

From May 27, 2020, to July 13, 2020, Plaintiff returned to Hartford for worsening joint pain, swelling, pustulosis, and increased pain.  *Id.* at 533–46.  Because Plaintiff's condition seemed non-responsive to treatment, a doctor at Hartford Healthcare ordered Plaintiff an MRI of both knees to assess whether Plaintiff had avascular necrosis.  *Id.*  at 640.  Despite Plaintiff's worsening condition, Plaintiff could walk with a normal gait using a cane for support.  *Id.* at 639.

From August 2020 through June 2021, Plaintiff's condition improved after he began intravenous infusions of a drug called Remicade.  During an August 6, 2020, visit, Plaintiff reported feeling much better with treatment.  *Id.* at 547.  Dr. Sheth noted Plaintiff was doing "dramatically well" on treatment through December of 2020.  *Id.* at 558, 625.  In December 2020, a second state doctor, Dr. Melanie Thompson, reviewed Plaintiff's medical records and opined that Plaintiff was not disabled, and could work at the medium exertional level.  *Id.* at 102–07.  Then, on February 18, 2021, a third state doctor, Dr. Lynne Torello, reconsidered Plaintiff's medical records and determined he could work at the light exertional level, rather than medium.  *Id.* at 113–15.  In April of 2021, Dr. Sheth noted that Plaintiff's SAPHO syndrome stabilized and that his flareups were manageable with medication, but that Plaintiff exhibited decreased range of

motion, tenderness, and pain in his lower back.  *Id.* at 641–48.  Finally, in June of 2021, Plaintiff

noted that his intermittent SAPHO flares were treated well with prednisone therapy.  *Id.* at 648.

However, by mid-summer, Plaintiff took a turn.  In a July 2021 visit, Plaintiff reported

recurring flares, knee swelling, and back spasms and pains that limited his ability to walk.  *Id.* at

674.  By this point, Plaintiff reported that his symptoms did not alleviate with prednisone or other

treatments, and was given local cortisone injections in his ankles.  *Id.*; *id.* at 680.  Then, in August

2021, Plaintiff's symptoms worsened still.  The last medical record, dated August 11, 2021,

indicated decreased range of motion and tenderness in both knees and his right-side ankle.  *Id.* at

692–97.  He was unable to bear any weight on his ankles at this visit.  *Id.* at 692.

### B.  Procedural History

On September 1, 2020, Plaintiff filed an application for SSDI alleging a disability

beginning on January 1, 2020.  Tr. at 218.  After review, the state agency denied Plaintiff's claim

by notice, dated December 1, 2020.  *Id.* at 123.  Shortly thereafter, Plaintiff requested

reconsideration of this determination, *id.* at 127, which was again denied by notice on February

18, 2021, *id.* at 130.

Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ") to review

his unfavorable determination.  *Id.* at 139.  On August 7, 2021, a video hearing was held before

ALJ John Aletta, at which both Plaintiff and a vocational witness testified.  *Id.* at 47–87.  During

the hearing, Plaintiff amended his disability onset date to April 3, 2020, the day he stopped

working.  *Id.* at 60–61.  On October 5, 2021, the ALJ denied Plaintiff's claim.  *Id.* at 33–41.  On

July 21, 2021, the Appeals Council denied Plaintiff's request for review.  *Id.* at 1–7.  After this

final denial of review, the ALJ's decision became appealable to this Court.

C.   The ALJ's Decision

In his written decision, the ALJ first determined that Plaintiff met the insured status requirements of the Social Security Act through September 30, 2024.  Tr. at 35.  He then applied the five-step evaluation framework for adjudicating SSI claims under 20 C.F.R. § 404.1520(a).  Tr. at 33–41.  At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since the alleged onset date.  *Id.* at 35.  At step two, the ALJ found that Plaintiff had the "severe impairments" of "synovitis, acne, pustulosis, palmaris, hyperostosis and osteitis (SAPHO syndrome), hidradenitis suppurativa and avascular necrosis of the left femur," whereas his other physical conditions, like his generalized back pain, were deemed nonsevere.  *Id.* at 35–36.  At step three, the ALJ found that "[t]he record does not establish the medical signs, symptoms, laboratory findings or degree of functional limitation require to meet or equal the criteria of any listed impairment and no acceptable medical source designated to make equivalency findings has concluded that the claim's impairment(s) medically equal a listed impairment."  *Id.* at 36.

Proceeding to step four, the ALJ determined Plaintiff's Residual Functional Capacity ("RFC") with all of his impairments and nonsevere conditions, including his back and joint paint, to be "sedentary work as defined in 20 CFR 417.967(a)," *id.* at 36, with the following additional limitations:  Plaintiff could only "occasionally climb ramps and stairs, could not climb ladders, ropes or scaffolds, could frequently stoop, and could occasionally kneel, occasionally court and occasionally crawl"; and (2) Plaintiff must "avoid concentrated exposure to extreme cold and could not work at unprotected heights or operate machinery having moving mechanical parts which are exposed."  *Id.*

Last, at step five, the ALJ concluded that, given this RFC, "[c]onsidering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in

significant numbers in the national economy that the claimant can perform." *Id.* at 40.  The ALJ based this finding largely on the vocational expert's testimony.  *Id.*  Therefore, Plaintiff did not qualify as "disabled."  *See id.* at 41.

## II.   LEGAL STANDARD

### A.  Legal Framework

Initially, "to be eligible for disability insurance benefits, an applicant must be 'insured for disability insurance benefits.'"  *Arnone v. Bowen*, 882 F.2d 34, 37 (2d Cir. 1989) (quoting 42 U.S.C. §§ 423(a)(1)(A), 423(c)(1)).  The parties do not dispute that Plaintiff is insured here.

A person is "disabled" and entitled to disability insurance benefits if that person is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(a).  A physical or mental impairment is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Id.* § 423(d)(3).  In addition, a claimant must establish that her "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. . . ." *Id.* § 423(d)(2)(A).

Pursuant to regulations promulgated by the Commissioner, a five-step sequential evaluation process is used to determine whether a claimant's condition meets the Social Security Act's definition of "disability." *See* 20 C.F.R. § 416.920.  The five steps are best summarized as:  (1) the Commissioner determines whether the claimant is currently engaged in substantial gainful activity; (2) if not, the Commissioner determines whether the claimant has a

severe medically determinable physical or mental impairment that meets the duration requirement in § 416.909 or a combination of impairments that is severe and meets the duration requirements; (3) if such a severe impairment is identified, the Commissioner next determines whether the medical evidence establishes that the claimant's impairment "meets or equals" an impairment listed in Appendix 1 of the regulations; (4) if the claimant does not establish the "meets or equals" requirement, the Commissioner must then determine the claimant's residual functional capacity ("RFC") to perform his past relevant work; and (5) if the claimant is unable to perform his past work, the Commissioner must next determine whether there is other work in the national economy which the claimant can perform in light of his RFC and his education, age, and work experience. *See Meade v. Kijakazi*, No. 3:20-CV-868 (KAD), 2021 WL 4810604, at *1 (D. Conn. Oct. 15, 2021); *see also* 20 C.F.R. §§ 416.920(a)(4)(i)–(v), 416.909.

The claimant bears the burden of proof with respect to steps one through four, though at step five "the burden shift[s] to the Commissioner to show there is other work that [the claimant] can perform." *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 445 (2d Cir. 2012); *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 123 (2d Cir. 2012). Once the ALJ identifies the jobs consistent with Plaintiff's RFC, either through the testimony of a vocational expert or the Medical Vocational Guidelines, the ALJ must determine whether these jobs exist in significant numbers in the national economy, the region where a claimant lives, or several other regions of the country. 20 C.F.R. § 416.966(a); *McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (stating the ALJ must show "there are significant numbers of jobs in the national economy that the claimant can perform").

## B. Standard of Review

It is well-settled that a district court will reverse the decision of the Commissioner as to whether a claimant is disabled only when it is based upon legal error or when it is not supported

by substantial evidence in the record. *See e.g.*, *Greek v. Colvin*, 802 F.3d 370, 374–75 (2d Cir. 2015) (*per curiam*); 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").

"Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (cleaned up). "In determining whether the agency's findings were supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam) (cleaned up). Under this standard of review, "absent an error of law, a court must uphold the Commissioner's decision if it is supported by substantial evidence, even if the court might have ruled differently." *Campbell v. Astrue*, 596 F. Supp. 2d 446, 448 (D. Conn. 2009). The court must therefore "defer to the Commissioner's resolution of conflicting evidence," *Cage*, 692 F.3d at 122, and reject the Commissioner's findings of fact "only if a reasonable factfinder would *have to conclude otherwise*," *Brault*, 683 F.3d at 448 (internal citation omitted) (emphasis in original). Stated simply, "[i]f there is substantial evidence to support the [Commissioner's] determination, it must be upheld." *Selian*, 708 F.3d at 417.

## III.   DISCUSSION

In his motion to reverse the Commissioner's decision, or in the alternative remand for a hearing, Plaintiff contends that: (1) the administrative record was not properly developed, ECF No. 16-2 at 1; (2) the ALJ's step two analysis was flawed, *id.* at 9; (3) the ALJ's step three findings were flawed, *id.* at 11; (4) Plaintiff's claims of pain were not adequately evaluated, *id.* at 13; and

(5) "the ALJ's step five findings were unsupported," *id.* at 16.  For the reasons set forth below, Plaintiff's Motion to Reverse is denied and Defendant's Motion to Affirm is granted.

A.  The ALJ Adequately Developed the Record

Plaintiff first argues that the "Commissioner has an unquestioned duty to develop the Record," which he contends the ALJ breached by failing to solicit medical source statements from Plaintiff's treating physicians.  ECF No. 16-2 at 1–8.  In particular, Plaintiff claims that the ALJ erred by failing to obtain (1) medical reports from Plaintiff's treating physicians detailing his "function-by-function capacities"; (2) documents showing that Plaintiff was "referred for physical therapy" by one of his treating physicians; and (3) records from a counseling service Plaintiff visited.  *Id.*

"The ALJ, unlike a judge in a trial, must himself affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding, even when the claimant is represented by counsel." *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999) (cleaned up) (quoting *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996)).  Thus, the ALJ has a duty to "investigate and develop the facts and develop the arguments both for and against the granting of benefits." *Vincent v. Comm'r of Soc. Sec.*, 651 F.3d 299, 305 (2d Cir. 2011).  This duty, however, is not without limits.  An ALJ has no duty to develop the record unless there are "obvious gaps or inconsistencies." *See O'Connell v. Colvin*, 558 F. App'x 63, 64 (2d Cir. 2014) (citing *Rosa*, 168 F.3d at 79 n.5).  Accordingly, the Second Circuit has found that an ALJ is under no obligation to further develop the record where it contained treatment notes from the claimant's treating physicians. *See Pellam v. Astrue*, 508 F. App'x 87, 90 (2d Cir. 2013) (summary order). *See also Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 34 (2d Cir. 2013) (summary order) (ALJ's failure to obtain medical opinions from treating physicians regarding claimant's residual functional

capacity was not error when the record was "adequate to permit an informed finding by the ALJ"); *Crespo v. Comm'n Soc. Sec.*, No. 3:18-CV-435 (JAM), 2019 WL 4686763, at *3 (D. Conn. Sept. 25, 2019) (ALJ's failure to obtain function-by-function assessments and medical source statements "was not legal error").

The ALJ did not err in developing the record because the ALJ relied on the reports of three State doctors and Plaintiff's medical record, which included treatment notes from the claimant's doctors. For example, in analyzing whether Plaintiff's conditions met any listed impairment in 20 C.F.R. § 404, Subpart P, Appendix 1, the ALJ relied on medical notes from Plaintiff's treating doctors. *E.g.*, Tr. at 36 (citing notes from Dr. Sheth). In fact, the ALJ's determination is replete with citations to reports from state doctors and with notes from Plaintiff's treating physicians. *See e.g.*, Tr. at 39 (citing state physicians' disability determination explanations and several progress notes from Dr. Sheth).

While Plaintiff admits that the ALJ relied on the analysis from the state physicians and the medical notes of Plaintiff's treating physicians, Plaintiff argues this was not enough. Instead, Plaintiff argues that the ALJ should have solicited an analysis of Plaintiff's function-by-function capabilities from one of Plaintiff's treating physicians, particularly Dr. Sheth. ECF No. 16-2 at 1. However, an ALJ is under no such obligation where the record is without obvious gaps. As the ALJ's extensive citations to the record show, the record does not have obvious gaps. The ALJ's decision is supported by a fulsome record replete with observations on Plaintiff's impairments and conditions.

Finally, that the ALJ did not solicit documentation that Plaintiff was referred to physical therapy is unavailing. Plaintiff argues that his "then-counsel and the [ALJ] had a discussion about these missing [records] at the hearing and that the ALJ stated that he would 'allow 14 calendar

days from today for [Plaintiff] to submit additional records . . . ."  ECF No. 16-2 at 2 (quoting Tr. at 53).  However, to the extent that these records existed and were relevant, no further records were submitted by Plaintiff's then-counsel, precluding Plaintiff's argument.  *Brown v. Colvin*, No. 3:14-CV-1784 (WIG), 2016 WL 2944151, at *2–3 (D. Conn. May 20, 2016) (finding that an ALJ has satisfied their duty to develop the record where no additional records are submitted after the ALJ holds the record open for two weeks).  Moreover, the counseling records appear to have little to no bearing on the question of whether Plaintiff's physical impairments rendered him disabled, so any failure to obtain them was inconsequential.  *See Crespo*, 2019 WL 4686763, at *5 (rejecting argument that record was insufficiently developed where claimant had not shown the "absence of meaningful records").  The ALJ therefore did not insufficiently develop the record.[6]

### B. The ALJ Did Not Err at Step Two

Plaintiff next contends that the ALJ's step two analysis is flawed because the ALJ made "no effort to assess the impact" of certain of Plaintiff's conditions on his ability to work.  ECF No. 16-2 at 9–11.  Specifically, he argues that it is "impossible to determine from the ALJ's decision the manner in which hidradenitis suppurativa and avascular necrosis of the left femur impose restrictions on [Plaintiff's] ability to engage in basic work activities," *id.* at 9, and that his back pain was not meaningfully considered at later steps in the analysis, *id.* at 10.

At step two of the analysis, the ALJ determines the severity of a claimant's impairments.  *See* 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  A "severe impairment" is one that "limits

---

[6] The Court also notes that, pursuant to 20 C.F.R. 404.1512(b), the Commissioner has an obligation to make "every reasonable effort" to develop the claimant's medical history for the twelve months preceding the filing of the application for benefits.  "Every reasonable effort," in turn, means that the Commissioner will make one initial request to a medical source, and one follow-up request.  *Id.* § 404.1512(b)(1)(i).  Here, Defendant requested that Dr. Sheth provide a medical source statement on three occasions, and did not receive a statement.  Tr. at 466, 501, 586.  *Cf. Guillen v. Berryhill*, 697 F. App'x 107, 109 (2d Cir. 2017) (summary order) (remanding where medical records were insufficient to offer insight into plaintiff's ability to work and it was "unclear from the record" that a request for a medical source statement from the plaintiff's treating physician was "even made").

[a claimant's] ability to do physical or mental work-related activities." *Greek*, 802 F.3d at 373 n.2. If the ALJ finds that a claimant has a severe impairment, then "the question whether the ALJ characterized any other alleged impairment as severe or not severe is of little consequence," *Jones-Reid v. Astrue*, 934 F. Supp. 2d 381, 402 (D. Conn. 2012), *aff'd*, 515 F. App'x 32 (2d Cir. 2013) (cleaned up), so long as the ALJ considered any non-severe condition "during the subsequent steps" in their analysis. *O'Connell*, 558 F. App'x at 65 (citing 42 U.S.C. § 423(d)(2)(B)). Where an ALJ considers a claimant's non-severe conditions in the subsequent analysis, "any error" made at step two is "harmless." *Id.*

There is no dispute that ALJ found that Plaintiff has severe impairments: "synovitis, acne, pustulosis, palmaris, hyperostosis and osteitis (SAPHO syndrome), hidradenitis suppurativa and avascular necrosis of the left femur." Tr. at 35. Plaintiff first claims error in the ALJ's failure to discuss how Plaintiff's hidradenitis suppurativa and avascular necrosis of the left femur affect his ability to engage in work. But the ALJ concluded that these impairments "significantly limit the ability to perform basic work activities." Tr. at 35. And, in any event, the ALJ discussed both the orthopedist's conclusion that a diagnosis of avascular necrosis was unlikely, *id.* at 36–37, and that prescribed medications resulted in minimal painful skin lesions—which hidradenitis suppurativa causes. *Id.* at 37.

Additionally, the Court finds that because the ALJ considered Plaintiff's back pain in subsequent steps, any step two error is harmless. Without pointing to evidence in the record, Plaintiff argues that "[Plaintiff's] lumbar impairments were not meaningfully 'considered as part of the remaining steps.'" ECF No. 16-2 at 10. But the record belies this assertion. For instance, the ALJ noted Plaintiff's "lower back pain and . . . severe swelling and pain in both knees and ankles" in its subsequent analysis. Tr. at 37. The ALJ also considered Plaintiff's back and knee

pain outside of the context of Plaintiff's SAPHO diagnosis.  *Id.* (Plaintiff "experienced daily knee and ankle pain independent of the [SAPHO] flares").   The ALJ concluded that Plaintiff's "significant low back, bilateral knee and ankle pain," did not otherwise impair Plaintiff's ability to perform sedentary work.  *Id.* at 38–39.  Thus, rather than ignoring the totality of Plaintiff's pains and conditions, the ALJ considered Plaintiff's non-severe conditions in the subsequent analysis.  Therefore, any step two error is harmless.

Because the ALJ did in fact consider the totality and interaction of Plaintiff's severe and non-severe conditions, any step two error is harmless.

## C.  The ALJ Did Not Err at Step Three

Plaintiff also contends that the ALJ erred in the step three analysis because the analysis is not "reasoned" or "well-supported."  ECF No. 16-2 at 11.  At step three, the ALJ determines whether a claimant's severe conditions meet the definition of an impairment listed at Appendix 1 to Subpart P of 20 C.F.R. § 404.  *See* 20 C.F.R. § 404.1520(d).  "The Social Security regulations list certain impairments, any of which is sufficient, at step three, to create an irrebuttable presumption of disability."  *DeChirico v. Callahan*, 134 F.3d 1177, 1180 (2d Cir. 1998) (citing 20 C.F.R. §§ 404.1520(d), 416.920(d)).   "The regulations also provide for a finding of such a disability *per se* if an individual has an impairment that is 'equal to' a listed impairment."  *Id.* (quoting 20 C.F.R. § 404.1520(d) ("If you have an impairment(s) which . . . is listed in appendix 1 or is equal to a listed impairment(s), we will find you disabled without considering your age, education, and work experience.")) (internal quotation marks omitted); *see also* 20 C.F.R. § 416.920(d).  "Plaintiff bears the burden at step three to show that his impairments meet or exceed all the medical criteria in a Listing."  *Salerno v. Berryhill*, No. 19-CV-627 (KHP), 2020 WL 882006, at *5 (S.D.N.Y. Feb. 24, 2020).  An ALJ who makes an adverse finding at step three,

meaning the ALJ has found that the claimant does not have a listed impairment, must "set forth a specific rationale" to support his conclusion. *Berry v. Schweiker*, 675 F.2d 464, 468 (2d Cir. 1982) (*per curiam*). However, "the absence of an express rationale does not prevent [the court] from upholding the ALJ's determination" so long as "the ALJ's decision and the evidence before him indicate that his conclusion was supported by substantial evidence." *Id.*; *accord Solis v. Berryhill*, 692 F. App'x 46, 48 (2d Cir. 2017) (citing *Schweiker*). Thus, a court will uphold an ALJ's step three analysis so long as the rationale is supported by substantial evidence on the record.

Plaintiff's concern with the ALJ's step three analysis is well placed. The ALJ does little if any analysis of Plaintiff's symptoms as they apply to a listed impairment. Tr. at 36. Rather, the ALJ cites Listing 14.09—for inflammatory arthritis—and then cites record evidence indicating that Plaintiff's conditions do not meet the criteria for this, or any, condition listed in Appendix 1. The ALJ's rationale is left wanting. However, this threadbare analysis is due, in part, to the fact that Appendix 1 does not list Plaintiff's severe impairment: SAPHO. Plaintiff contends that the ALJ erred by analyzing Plaintiff's condition under Listing 14.09 and for failing to interrogate the record evidence. ECF No. 16-2 at 11–13. The Court disagrees.

First, the ALJ did not err in step three because substantial evidence supports the determination that Plaintiff's conditions do not meet the criteria in Listing 14.09 for inflammatory arthritis. A condition is "equal to" a disability listed in Appendix 1 if "there is no meaningful difference between" the claimant's conditions and those in the listing. *Beers*, 449 F. Supp. 2d at 99. As Plaintiff admits, SAPHO syndrome does not fit neatly into the Listings. *Id.* at 13 n.33. Further, he "does not have inflammatory arthritis" and his "condition did not (indeed, it could not) meet Listing 14.09." *Id.* at 13 n.33. As the ALJ found, and the record supports, Plaintiff's SAPHO symptoms are meaningfully different from the criteria in Listing 14.09.

Indeed, there is substantial record evidence to support this conclusion.  As the ALJ explained, "the physical examination findings, the observations of the claimant in the medical records and his statements to his treating clinicians about his response to prescribed treatment do not support the level of severity described in this listing."  Tr. at 36.  The State agency physicians considered Plaintiff's symptoms in light of Listing 14.09, concluding that Plaintiff did not meet that listing's requirements.  ECF No. 20-1 at 7; Tr. 93–94, 104.  Specifically, two of the state agency doctors determined that Plaintiff did not meet that listing's requirements.  Tr. 93–94, 104.  Because Plaintiff admits he could not meet Listing 14.09's requirements, and because record evidence supports this decision, the ALJ did not err in making this finding.

Second, the ALJ did not err in finding that record evidence could not support finding that Plaintiff could not meet the requirements for any listing in Appendix 1.  Despite Plaintiff bearing the burden at step three, Plaintiff has pointed to no listing which he believes his conditions satisfy the requirements.  Plaintiff has not claimed that his condition satisfies any listing, and the Court has identified none.

Thus, substantial evidence on the record supports the ALJ's decision at step three.

### D.  The ALJ Adequately Evaluated Plaintiff's Pain

Plaintiff also argues that the Court should reverse the decision because the ALJ inadequately evaluated Plaintiff's "chronic pain," which Plaintiff argues "disabled [him] in whole or in part."  ECF No. 16-2 at 13.  For substantially the same reasons discussed in the context of the ALJ's step two and three analyses, the Court rejects this claim.

To the extent Plaintiff believes the ALJ did not address Plaintiff's complaints about his pain, the ALJ did consider Plaintiff's pain.  As part of the RFC analysis, the ALJ frequently noted Plaintiff's pain.  Tr. at 37 ("lower back pain," "severe swelling and pain in both knees and ankles,"

"greatest pain in his right knee, ankles and feet," "[h]e used several medications for pain and inflammation," "problems bending due to knee pain," "[h]e had difficulty concentrating when he was in extreme pain," "[h]e experienced daily knee and ankle pain"). Thus, the ALJ properly considered the totality of Plaintiff's pains and conditions as it impacted Plaintiff's experience of his pain and his ability to perform basic work activities.

To the extent that Plaintiff challenges the ALJ's determination that Plaintiff's pain did not rise to the level of disability on its own, ECF No. 16-2 at 14, substantial evidence on the record supports the ALJ's decision. While the ALJ acknowledged Plaintiff's pain, the ALJ also noted that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record . . . ." Tr. at 37. For example, the ALJ noted that the "use of prescription medications resulted in minimal painful skin lesions," that despite Plaintiff's joint tenderness "his physical examinations were essentially normal," that treatment alleviated Plaintiff's "low lying aches," and that injections and prescribed medications relieved Plaintiff's "intermittent low back pain" and "bilateral ankle and knee pain related to active synovitis." Tr. at 37–38. The medical evidence in the record supports these findings. *See id.* at 111–12 (summarizing Plaintiff's medical history, including Plaintiff's positive responses to treatments alleviating pain). Thus, far from ignoring Plaintiff's complaints about his pain, the ALJ acknowledged this pain and the bevy of treatments that proved promising. Rather than rendering him disabled, Plaintiff's symptoms were effectively moderated with treatment.

For these reasons, the Court concludes substantial evidence supports the ALJ's finding that Plaintiff's chronic pain did not rise to the level of disability.

E.  The ALJ Did Not Err at Step Five

Lastly, Plaintiff contends the ALJ did not meet his burden at step five.  Specifically,
Plaintiff claims (1) the vocational witness's testimony is unreliable because she did not identify
the "basis of her job incidence testimony," and (2) the vocational witness's testimony is flawed
because the hypothetical posed by the ALJ did not "accurately portray[] the claimant's individual
physical and mental impairments."  ECF No. 16-2 16–22.  The Court finds the ALJ's step five
analysis is supported by substantial evidence.

1.  *Job Incidence Testimony*

At step five, an ALJ "must determine that significant numbers of jobs exist in the national
economy that the claimant can perform."  *McIntyre*, 758 F.3d at 151 (citing 20 C.F.R.
§§ 404.1520(a)(4)(v), 416.920(a)(4)(v)).  Plaintiff argues that the vocational expert's methodology
in determining the number of jobs was flawed because the vocational expert did not identify the
sources supporting her testimony.  On this point the ALJ did err not err.

"An ALJ does not err when he relies on a vocational expert's testimony that is based on
personal experience, labor market surveys, and published statistical sources in determining the
number of jobs available."  *Debiase v. Saul*, No. 3:19-CV-68 (RMS), 2019 WL 5485269, at *11
(D. Conn. Oct. 25, 2019).  In fact, an ALJ may rely on a vocational expert's testimony even where
the expert declines to disclose "all data she has considered in reaching her conclusions."  *Biestek
v. Berryhill*, 587 U.S. __, 139 S. Ct. 1148, 1154 (2019).  When an expert refuses or has not
volunteered the basis for their testimony, the Supreme Court has directed lower courts to take a
"case-by-case" approach in determining whether an expert "ha[d] no good reason to keep the data
private and her testimony lack[ed] other markers of reliability."  *Id.* at 1157.  Accordingly, an ALJ
may "reasonably credit[] [ ] testimony, which was given on the basis of the expert's professional

experience and clinical judgment, and which was not undermined by any evidence in the record." *McIntyre*, 758 F.3d at 152.  In other words, such testimony can be substantial evidence supporting an ALJ's findings.  *See Biestek*, 139 S. Ct. at 1155.

Plaintiff's argument concerning the expert's methodology centers on the fact that the expert "was not asked to identify the basis of her job incidence testimony, and she did not volunteer that critical information."  ECF No. 16-2 at 16.  Plaintiff's arguments are unavailing.  The Court agrees with Judge Meyer's thoughtful opinion in *Crespo* on this issue.  As he explained, the Second Circuit has not ruled that a vocational expert must specifically identify the "figures or sources supporting his conclusion."  *Crespo*, 2019 WL 4686763, at *8 (quoting *McIntyre*, 758 F.3d at 152). While *McIntyre* caveated its holding to cases where the expert identifies the sources generally, it also held that the ALJ there had appropriately credited the testimony of the vocational expert, "which was given on the basis of the expert's professional experience and clinical judgment."  *Id. See also Bayliss v. Barnhart*, 427 F.3d 1211, 1218 (9th Cir. 2005) (noting that a vocational expert's recognized expertise "provides the necessary foundation for his or her testimony," and "no additional foundation is required").  Moreover, *Biestek* suggests that there is no categorical rule requiring a vocational expert to disclose the general source of jobs number data in the absence of any request.  *Crespo*, 2019 WL 4686763, at *9 (citing *Biestek*).  Plaintiff's argument is hard to square with the Supreme Court's holding that lower courts may uphold an ALJ's decision where the vocational expert declines to provide the basis of their opinion in response to a request to furnish such data.  If a court may affirm an ALJ's decision where the vocational expert *refuses* a request to provide the statistical basis for their testimony, this Court will not adopt Plaintiff's blanket rule that an ALJ errs any time that a vocational expert fails to volunteer such information.

Instead, analyzing these circumstances on a case-by-case basis as instructed by *Biestek*, the record supports the ALJ's determination because the expert witness's testimony was reliable. While the ALJ never questioned the expert on the sources for her job incidence figures, Plaintiff's counsel lodged no objections to her testimony when prompted by the ALJ. Tr. at 74. Further, as pointed out by the government, the ALJ reasonably relied on the expert's use the Dictionary of Occupational Titles ("DOT") and on her "30 years of experience" with placing individuals with disabilities in employment. ECF No. 20-1 at 21; Tr. at 351–52 (expert's résumé). The ALJ's reliance on the DOT and the expert's professional experience provide the markers of reliability that meet the low threshold for substantial evidence. *See Crespo*, 2019 WL 4686763, at *9 (finding the same); *Gaskin v. Berryhill*, No. 3:18-CV-1978 (RAR), 2020 WL 3958421, at *10 (D. Conn. July 13, 2020) (same). Thus, the ALJ's decision to rely on the expert's testimony is supported by substantial evidence on the record.

### 2. *Hypothetical Posed to Vocational Expert*

Second, Plaintiff argues that the hypothetical question posed by the ALJ to the vocational expert was defective. ECF No. 16-2 at 20.

"An ALJ may rely on a vocational expert's testimony regarding a hypothetical as long as 'there is substantial record evidence to support the assumption[s] upon which the vocational expert based his opinion,' and accurately reflect the limitations and capabilities of the claimant involved." *McIntyre*, 758 F.3d at 151 (internal citations omitted) (quoting *Dumas v. Schweiker*, 712 F.2d 1545, 1553–54 (2d Cir. 1983)).

The ALJ proffered two hypotheticals. The first posited an individual who could perform "work at the light exertional level," Tr. at 76, and who could "occasionally climb ramps and stairs, cannot climb ladders, ropes, or scaffolds, can frequently balance and frequently stoop, and can

occasionally knee, occasionally could, and occasionally crawl," *id.*  In the second hypothetical, the ALJ hypothesized an individual who "had all the same limitations of Hypothetical #1, but . . . could perform work at the sedentary exertional level," instead of the "light" level.  *Id.* at 80.

Plaintiff argues that the ALJ's two hypotheticals were not accurate because the ALJ should have relied on physicians who had "actually treated [Plaintiff]."  ECF No. 16-2 at 21.  Plaintiff does not explain in which ways he disagrees with the ALJ's hypotheticals, but only that they should have been based on "medical source statements from any of [Plaintiff's] treating physicians."  ECF No. 61-2 at 20.  As noted above, the ALJ did not err in failing to obtain medical source statements. Moreover, without clarity as to which aspects of the two hypotheticals are objectionable, the Court finds it difficult to properly address Plaintiff's arguments.

That said, even if Plaintiff could point with clarity to specific portions of the two hypotheticals that were flawed, both hypotheticals—and, ultimately, the ALJ's RFC finding—are supported by substantial evidence on the record.  The reports from the three state doctors support the ALJ's hypotheticals.  All three doctors note Plaintiff's limitations with regard to ramps, stairs, ladders, ropes, and other postural limitations. Tr. at 99, 105, 113–14.  The ALJ's two hypotheticals account for these postural limitations.  As to the ALJ's hypothetical exertional levels, two doctors concluded that Plaintiff is capable of light exertional work, Tr. at 97, 114–15, while a second doctor concluded Plaintiff capable of medium exertional work, Tr. at 107.  Additionally, the ALJ considered the limitations suggested by Dr. Sheth's treatment notes.  By crafting hypotheticals that reflected Plaintiff's postural limitations at or below the exertional level recommended by the state doctors and that were consistent with Dr. Sheth's treatment notes—i.e., light exertion (hypo 1) and sedentary exertion (hypo 2)—the ALJ's two hypotheticals are supported by substantial evidence.

The ALJ therefore appropriately relied on the vocational expert's answers to those hypotheticals in concluding that Plaintiff is not disabled.

**IV.      CONCLUSION**

For the reasons described herein, Plaintiff's motion to reverse the Commissioner's decision or, in the alternative, remanding the matter is DENIED.  Defendant's motion for an order affirming the Commissioner's decision is GRANTED.  The Clerk is ordered to close this case.

**SO ORDERED** at Hartford, Connecticut, this 25th day of September, 2023.

_/s/ Sarala V. Nagala_____
SARALA V. NAGALA
UNITED STATES DISTRICT JUDGE